IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ANDREA HEATHER DICKINSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 15-CV-398-PJC |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of the | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Claimant, Andrea Heather Dickinson ("Dickinson"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Dickinson's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. [Dkt. 11]. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Dickinson appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred in determining that Dickinson was not disabled. For the reasons discussed below, the decision of the Commissioner is AFFIRMED.

**Procedural History**

On September 13, 2012, Dickinson protectively filed her application for disability insurance benefits alleging an onset date of December 15, 2009. (R. 307-314, 323).[1] The

---

[1] A request to amend the alleged onset date to July 1, 2012 was sent by Dickinson's attorney to the agency on Oct. 1, 2013. (R. 323). However, at the hearing on Oct. 31, 2013, Dickinson's attorney did not mention the request for an amended onset date and the ALJ's decision apparently presumes an alleged onset date of December 31, 2009. (R. 37, 196).

application was denied initially and on reconsideration. (R. 256-260, 264-266). An administrative hearing was held before ALJ Richard J. Kallsnick on October 31, 2013. (R.190-227). The ALJ entered a decision on December 18, 2013, finding Dickinson was not disabled within the meaning of the Social Security Act prior to the expiration date of her insured status and was, therefore, not entitled to benefits. (R. 37-47). The Appeals Council denied Dickinson's request for review on May 18, 2015. (R. 1-7). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. § 404.981, *Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003).

## Social Security Law and Standard Of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[2] *See also Wall v. Astrue*, 561 F.3d 1048, 1052-53 (10th Cir. 2009)

---

[2] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden

(detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Lax v. Astrue*, 489 F.3d at 1084 (citation and quotation omitted).

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision is supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted). Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Wall*, 561 F.3d at 1052 (quotations and citations omitted). Although the court will not reweigh the evidence nor substitute its judgment for that of the Commissioner, the court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Id.* Even if the court would have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. *See White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

**Claimant's Background**

Dickinson was 41 years old on her alleged disability onset date, September 1, 2010, and she was 45 years old when the ALJ entered his decision on August 15, 2013. (R. 307-314, 34). On the disability form submitted by Dickinson with her application for benefits, Dickinson claimed disability due to bi-polar, depression and high blood pressure. (R. 328). She said she

---

shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

stopped working on December 15, 2009, because the company downsized and she "did not fit in... they asked for [her] resignation ... and [she] got upset .... they fired [her]." *Id.* On her function report, Dickinson said she cannot stand for long periods, that she does not work well with others due to bi-polar and depression issues and that she is very paranoid and untrusting of all people. (R. 346). Regarding daily activities, Dickinson reported she wakes up, showers, has breakfast and coffee, gets her husband off to work and does light house cleaning. (R. 347). She feeds the dogs but does not take them for walks. *Id.* She prepares meals of grilled cheese, Ramen noodles and microwave food. (R. 348). Daily household chores consist of dusting, loading the dishwasher, wiping off counters and the kitchen table, watering plants and feeding the dogs. *Id.* She requires help lifting or carrying heavy things and needs reminders to do these chores because she is forgetful. *Id.* She can go out alone and can drive or ride in a car. (R. 349). She shops for groceries two to three times a month for twenty to thirty minutes. *Id.* She "cannot stand long or be around people for long." *Id.* She watches television each day and reads on occasion and she does "these things very well." (R. 350). She goes to the doctor usually once a month. *Id.* Dickinson stated that she does not get along with people, she does not like people and is paranoid and she cannot trust people. (R. 351). She reported she does not socialize with people at all, she does not like to talk on the phone, she does not like visiting because she feels paranoid and that "it is dangerous." (R. 351). Her depression and bi-polar disorder makes her moody, she cannot stand for long periods of time, she has no focus, does not like or trust people and has no social interest. *Id.* She claimed she can pay attention about ten to twenty seconds, that she does not follow written instructions well because she has no focus or concentration and that she "cannot at all" follow spoken instructions because she does not and cannot pay attention. (R. 351).

Dickinson claimed she cannot handle stress, she throws a fit and worries constantly, and that she does not adjust well to changes in routine. (R. 352).

At the administrative hearing on October 31, 2013, Dickinson testified that she was forty-five years old and that she last worked as a teller at a credit union in December, 2009. (R. 196). She testified that she was fired from her job because she had an unbalanced teller drawer. (R. 197). She testified that she applied for several different jobs throughout the next year but her back was progressively getting worse and she developed more of a phobia being around people. (R. 198). Dickinson testified that she has pain in her lower back, in her legs, feet and hips. (R. 199). She was not sure whether the pain in her hips was related to her lower back problem. *Id.* Her medications were Flexeril and Meloxicam. (R. 200). Dickinson did not know if her primary care provider, Lily Peňa at Morton Clinic, is a doctor or a physician assistant. *Id.* In the past, Dickinson was treated by Dr. Oatman who provided medication for blood pressure and bipolar, anxiety. *Id.* Dickinson testified that pain and her mood interfere with her ability to focus and concentrate. (R. 205). She said that her mind wanders, that she has trouble with her memory and that her husband has to remind her to take her medications on a daily basis. (R. 206-207). Dickinson testified that she was being treated for bi-polar disorder at Family and Children's Services (F&CS) by Dr. Wise, Dr. Adams and Rebecca Klein. (R. 207). Her therapist or counselor is Trish Doss. *Id.* Dickinson reported she has been seeing Ms. Doss for over a year on a monthly basis. (R. 208). About eighty percent of her bi-polar episodes are severe depression and prominent every day. *Id.* Her manic episodes are uncontrollable, hateful fits. *Id.* She used to have excess energy during those times but now that she is having so many problems with her body, she is not so inclined to have high energy days anymore. (R. 209). On bad days, she cries a lot or she is hateful. *Id.* She isolates herself from others in her household on her bad days. (R.

209-210). She has those bad days about eight to ten times a month. *Id.* Anxiety is always present and she has panic attacks caused by stress about once or twice a month. (R. 211-212). On days that are not bad days, she does a few dishes, wipes down the kitchen and bathroom cabinets and folds laundry. (R. 212-213). Dickinson testified that she is living alone, that she would not want to visit with anyone and she would not leave the house. (R. 210). Her husband, who does not live in the same household, helps with the chores and takes care of her on a daily basis. (R. 213). Dickinson testified that she drives for short trips because her back hurts. (R. 214). Her husband cooks for her most of the time. *Id.* He does most of the grocery shopping and he "makes [her] go to Walmart with him so [she] can pick out what she want[s]." *Id.* She does not stay at the store over thirty minutes because her feet, legs and back will hurt. (R. 215). During the day she passes the time by doing the few chores that she can do, watches a little TV and tries to read. *Id.* She tries to use a computer but rarely does. *Id.*

Going over the medication list Dickinson provided at the hearing, the ALJ noted that most of the prescriptions were for high blood pressure and asked Dickinson whether her blood pressure is under control. (R. 216). Dickinson testified that it is not under control and that her physician had just "upped" the medicine the week before. *Id.* Dickinson said that she is not aware of any side effects caused by her medications. (R. 217, 376).

**Decision of the Administrative Law Judge**

In his decision, the ALJ found at Step One, that Dickinson had not engaged in any substantial gainful activity since her alleged onset date of September 1, 2010, through the date she was last insured, December 31, 2012. (R. 39). At Step Two, the ALJ found that Dickinson has severe impairments of: joint pain, back pain, obesity, hypertension, bipolar disorder, and anxiety disorder. *Id.* The ALJ found at Step Three that Dickinson's mental impairments through

the date last insured did not meet or equal the severity of any listed impairment. *Id.* He found that Dickinson's impairments, through the date she was last insured, caused mild restrictions in her activities of daily living, and moderate difficulties in social functioning and with regard to concentration, persistence and pace. (R. 40). He concluded that Dickinson had experienced no episodes of decompensation, which have been of extended duration. *Id.*

The ALJ found that Dickinson had the following RFC, through the date she was last insured:

> The claimant can lift and carry 20 pounds occasionally and 10 pounds frequently. She can stand and walk up to 3 hours in an 8-hour workday and sit for 6 hours in an 8-hour workday. She can perform simple tasks with routine supervision. She can have superficial contact with co-workers and supervisors but cannot relate with the public. She is afflicted with symptomatology from a variety of sources that produces mild to moderate chronic pain, which is of sufficient severity to be noticeable to her at all times, but nonetheless she should be able to remain attentive and responsive in a work setting and can carry out work assignments satisfactorily. She takes medication but that would not preclude her from functioning at the level as restricted and she would remain reasonably alert to perform required functions in the work setting.

(R. 41).

As support for this assessment, the ALJ summarized Dickinson's testimony and noted that the statements in Dickinson's function reports regarding her subjective complaints were of the same general nature. (R. 42). The ALJ also summarized medical evidence regarding her physical and mental impairments. (R. 42-44). The ALJ noted in particular that Dickinson had received only sporadic mental health care from 2005 through 2012 and that on September 26, 2012, treatment records indicated Dickinson's sleep was regular, that she was no longer having nightmares, that her attention and concentration was adequate and that she had average judgment and insight. (R. 44).

Regarding the opinion evidence, the ALJ afforded great weight to the opinion of the State agency physicians that Dickinson could perform simple tasks with routine supervision and that she could relate to supervisors on a superficial work basis but could not relate to the general public. *Id.* The ALJ considered the medical source statement by Trish Doss, BS, BHRS, dated June 25, 2013. (R. 44-45). He noted that behavioral health rehabilitation specialists are not acceptable medical sources but stated that he considered her opinion as "a source who provides some treatment to the claimant." (R. 45). He compared Doss' statement that Dickinson had a moderate limitation in the ability to carry out simple instructions, a mild limitation in ability to understand and remember simple instructions and marked limitations in all other areas of mental functioning with Doss' own and other F&CS treatment records and found that the statement was inconsistent with those records. (R. 43-45). He observed that the majority of the treatment records revealed that Dickinson's attention and concentration was adequate and that she communicated appropriately. *Id.* He also noted that Ms. Doss had reported progress in Dickinson's symptoms of panic, agoraphobia and sleep difficulties with treatment. *Id.* The ALJ observed that there were gaps in treatment between 2005 and 2008 and noted that Dickinson had reported medications had been helping when she finally sought treatment in February 2010 and then again in July 2012. (R. 43-45). The ALJ considered the GAF scores throughout Dickinson's treatment records and determined that they are of limited evidentiary value. (R. 45).

After review of the medical and other evidence, the ALJ concluded that Dickinson's medically determinable impairments were not severe enough to prevent her from participating in substantial gainful activity and stated that he had accommodated her limitations in the RFC he had assessed. (R. 45). The ALJ found at Step Four that, through the date last insured, Dickinson was unable to perform her past relevant work. (R. 45). Based upon the testimony of a vocational

expert, the ALJ found at Step Five that, through the date last insured, a significant number of jobs existed in the national economy that Dickinson could perform, taking into account her age, education, work experience and RFC. (R. 46). The ALJ thus found that Dickinson was not under a disability at any time from December 15, 2009, the alleged onset date, through December 31, 2012, the date Dickinson was last insured. (R. 47).

## Review

Dickinson's allegations of error are limited to the portion of the ALJ's decision that dealt with her mental impairments. [Dkt. 19]. Therefore, the court's discussion of its review of the ALJ's decision and the evidence in the record addresses only the evidence related to Dickinson's allegations, although the entire record has been reviewed.

Dickinson first contends that the ALJ "failed to give proper evidentiary weight to the expert medical opinion of Plaintiff's treating psychotherapist, Trish Doss, BA, BHRS, BHCM." [Dkt. 19, at 5]. In response, the Commissioner points out that Ms. Doss' June 2013 statement was completed after the date Dickinson was last insured and that she is not an acceptable medical source who can render a medical opinion or whose opinion is entitled to controlling weight. [Dkt. 22, at 5]. The Commissioner observes that the ALJ nonetheless properly considered Ms. Doss' statement as an "other source" that can show the severity of a claimant's impairments and how they affect the claimant's ability to work. [*Id.*, at 6].

The parties do not dispute that the date Dickinson was last insured for disability benefits was December 31, 2012. Her last day of work was December 15, 2009. Therefore, she must establish disability between December 15, 2009, and December 31, 2012, the "relevant period." *See Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360 (10th Cir. 1993) (stating claimant must establish onset of disability prior to date insured status expired). In this context,

9

"disability" requires both an "inability to engage in any substantial gainful activity" and "a physical or mental impairment, which provides reason for the inability." *Barnhart v. Walton*, 535 U.S. 212, 217, 122 S.Ct. 1265, 152 L.Ed. 2d 330 (2002) (internal quotation marks omitted).  The impairment must be a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See Fischer-Ross*, 431 F.3d 729, 731 (10th Cir. 2005) (quoting 42 U.S.C. § 432(d)(1)(A)).

<u>Treatment Records</u>

As noted by the ALJ, Dickinson received sporadic treatment and medication from a mental health center in 2005 and 2008 and refills of her medications at urgent care centers through 2009, while she was still working. (R.407-427, 435-464). Her diagnosis was Bipolar Affective Disorder, Depressed, Severe with Psychosis and Borderline Personality. *Id.*

The record shows that Dickinson sought mental health treatment at F&CS on July 17, 2012, approximately five months before the date she was last insured. (R. 481-490). On that date, Dickinson was interviewed by Kristy Jones Matthes, BHRS, BS, CC. (R. 484, 487, 489).  During her initial assessment, Dickinson reported she had been previously diagnosed with bipolar disorder and had first noticed the symptoms twenty years ago. (R. 485).  She complained of depression, including sadness, hopelessness, fatigue, feelings of guilt and worthlessness, increased sleep, poor sleep, irritability, isolating from others, decreased energy, anhedonia and thoughts of dying. *Id.* She reported she had no close friends and that it is difficult for her to trust other people. She said that in the past, she had more friends and was better able to be around other people when she was on medications and her mood was better. (R. 486).

On August 22, 2012, Dickinson saw Naveen Kumar, M.D., at F&CS. (R. 491). She complained that the medications she started on the 8th of the month were making her more depressed and more anxious and that she had gained weight. *Id.* She reported she had done well on Xanax in the past but was aware that it was "not given out here." *Id.* Dr. Kumar discontinued trazodone, perphenazine and Topamax and commenced Trileptal, Zoloft and Ambien. *Id.*

On September 26, 2012, Dickinson reported to Rebecca Cline, NP, RN, that she still felt "pretty bad" but that the medications were a "God send" and that her sleep was regular and wonderful with Ambien, that she had lost weight but still had a short temper. (R. 492). She was continued on the medications with the plan to titrate and discontinue trileptal and lamictal and add perphenazine. *Id.*

On November 13, 2012, Patricia Doss, BHRS, CCMC and Rebecca Hunter, BA, BHRS, CCMC, reported that Dickinson presented as a walk-in appointment with a sad mood and tearful affect, that she maintained some eye contact and communicated appropriately with clear speech. (R. 518-519). Dickinson was requesting emotional behavioral well being and prescription assistance programs. *Id.* She was referred to several prescription assistance programs which were explained to her. *Id.* Dickinson reported that she was married but not sleeping in the same room with her husband but that he was supportive and wanted her to get better. *Id.* She said: "he tries to make me happy, but cant, so he told me to just work on getting better." (sic) *Id.* Dickinson reported that her husband supports them both because she is applying for SSI and that they struggle a lot due to how much they must spend on prescription medications. *Id.* Dickinson claimed that she had been on several different medications but "none of them work." *Id.* She stated she would come back tomorrow "first thing in the morning" so there might be fewer people. *Id.*

Dickinson's next visit to F&CS was January 28, 2013, almost a month after the date her insured status expired. (R. 520-521). She was seen by Jake Butler, BHRS, CCMC. (R. 521). She presented alone, alert, well-groomed and oriented and she displayed a stable mood and affect. Her treatment plan was reviewed and updated. (R. 520).

Patricia Doss saw Dickinson on February 28, 2013, April 4, 2013, June 25, 2013, and July 17, 2013. (R. 522-528). At the February 2013 appointment, Ms. Doss noted that Dickinson presented with a calm mood and affect. (R. 522). Ms. Doss reported that she "actively monitored cl progress and supported cl in effort to continue recovery by re-engaging in treatment." *Id.* Ms. Doss listened to Dickinson about her continued need for medical (physical) care and linked her to Morton clinic and assisted her in completing and submitting an application for Morton services. *Id.* At the April 2013 appointment, Ms. Doss helped Dickinson find a cost effective place to have her young dog that was described as "very high strung" spayed in order to calm the animal down some. (R. 523). At the end of the session, Ms. Doss wrote: "Cl reports no current barriers to access. Good progress noted ... Client to follow with CM on 5/15/13. Ct to follow up with doctor on 5/28/13. Cl reported no new needs today to be addressed at next visit." *Id.*

On June 25, 2013, Ms. Doss filled out the statement at issue in this case. (R. 505-506). Her treatment notes from that date indicate that Dickinson was alert, appropriately groomed and oriented, that she presented with anxious/stressed mood and congruent effect, that she maintained positive eye contact and communicated appropriately with clear speech and that she was requesting assistance with SSDI paperwork and a letter of diagnosis. (R. 525). The following is the remainder of the content of that report:

> Intervention/Actions Taken in Session:
> CM advocated for cl by inquiring about current disposition and assessing current needs. CM actively monitored cl progress and supported cl in effort to continue

recovery by re-engaging in treatment. CM monitored for and assessed barriers to treatment. CM worked with cl to plan for next session and to remove barriers to access. CM provided active listening to client. CM linked client to Letter of Diagnosis for her attorney after appropriate releases were signed. Letter and release sent to medical Records. CM completed document requested from attorney which did not require Doctor/Therapist signature. No credentialing restrictions were noted on document. CM linked client to letter to give to her attorney form supervising physician at FCS regarding SSA Disability documentation which request doctors to complete and sign.[3] CM and client discussed client participation in therapy. CM explained therapy referral process. CM and client discussed coping skills and willingness to make difficult changes in order to obtain a healthy/lasting recovery. CM and client discussed what coping skills to utilize in uncomfortable public situations to maintain stability during those times. (sic)

Response/Client Response to and Participation in Session:
Client presents to appt worried and anxious. Client reports that she feels this way after a man in the loby sat down next to her, turned his chair toward her and stared at her constantly the entire time they were waiting. Client reports that she did not know what to do. She reports that she almost left because this situation was so uncomfortable for her. Client presents documents from her attorney and requests a letter of diagnosis to give to attorney. Client reports that she is interested in therapy, but reports that she does not know if it will do any good. Client states, "I feel that no matter what I do I am not going to get any better. I have built up a wall around me and I don't let anyone else in. I feel that I am safe there and if I don't trust anyone, no one can hurt me." Client states, "Even with you (referring to CM), I feel like I don't want to see you anymore because I have told you secrets about me and that makes me not want to see you. It not that I think you are judging me, its that I feel like I am beginning to trust you and I don't I automatically want to run away because I am afraid to trust anyone." Clietn (sic) states that she realizes that her thoughts can be irrational, but she states, "it is safe here." referring to the wall she has built around herself. Client states that she would like to try therapy, and will attempt to go into it without expectations of outcome. Client states that she will continue to work on her coping skills. Client aware that CM will call on 7/2/13 to complete therapy referral due to time restraints this date. Client reports that she has documents that she attempted to Client was responsive to assistance provided. Ct states, "Thank you." (sic).

---

[3]That letter is found in the record at page 479. It states in part: "Our physicians are not trained in disability claims and most of the questions involved on the standard forms do not generally correlate with psychiatric assessments. Therefore, we are usually unable to provide adequate responses to the questions." *Id.*  The letter is signed by physicians, an Advanced Nurse Practitioner and the Medication Clinic Operations Manager for F&CS. *Id.*

>Progress &/Barriers to current Goals/Objectives:
>Cl reports panic and agoraphobia as current barriers to access. Some progress noted. (sic)
>
>Plan/Identified New Need(s), Goal(s), and/or Objective(s):
>Client to follow with CM via phone appt on 7/2/13 to f/u regarding therapy referral and scheduling TPU as time restraints prevented these things from being completed this date. Ct to follow up with doctor on 9/14/13. (sic)

(R. 525-526).

In the "letter" Ms. Doss signed for Dickinson, she identified herself as a Case Manager for Harvard Office Mental Health Department with Family & Children's Services. (R. 504). Dickinson's diagnoses were: "BIP 1, MRE SEV W/O FEA; AMPHETAMINE DEPENDENCE; ALCOHOL DEPENDENCE; PANIC D/O W/ AGORAPHOBIA." *Id.* Medications were perphenazine, lamictal, zoloft, ambien and resperdal. *Id.* Ms. Doss wrote:

>Andrea is currently engaged in Treatment services on a regular basis. Andrea reports that she still struggles with a number of issues, but reports neither drugs, nor alcohol play a part in those struggles. Andrea reports that she has not used any illicit drugs or alcohol since 1999. Andrea has scheduled an appointment to see a doctor September 4, 2013 and is scheduled to speak with me, her Case Manager on July 2, 2013."

*Id.* The Medical Source Statement - Mental form that Ms. Doss filled out indicated "mild" limitations in Dickinson's ability to understand and remember simple instructions, "moderate" limitations in her ability to carry out simple instructions and "marked" limitations in abilities to make judgments on simple work-related decisions, interact appropriately with the public, supervisors and co-workers, respond appropriately to usual work situations and to changes in a routine work setting, in ability to complete a normal work-day and work-week without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 505-506). Ms. Doss wrote: "client is

14

engaged in MH Treatment. Client displays difficulty in social situations, as noted by interactions with client over the past year. See letter attached for diagnosis." (R. 506).

On July 17, 2013, Ms. Doss and Dickinson collaborated on evaluating and developing service plan goals and objectives. (R. 527-528). Dickinson was scheduled for case management appointment on August 1, 2013, and was to follow-up with the doctor to continue medication to maintain stabilization of symptoms. *Id.* The treatment plan dated July 17, 2012, indicates that Dickinson was to meet with medical staff monthly, or as recommended, and comply with medication regime. (R. 531-534). On the objectives for learning and practicing self-monitoring, relaxation techniques, coping skills, and managing symptoms, "no progress" was noted because "client has not met with a consistent CM enough to work on this objective." (R. 533).

Discussion

This was the evidence upon which the ALJ determined that Dickinson's mental impairments were not disabling. In his decision, the ALJ thoroughly chronicled the medical evidence. (R. 43-5). The ALJ noted that Ms. Doss is not an "acceptable medical source" but, nonetheless, considered her opinion as a treating source. (R. 45). This comports with the regulations that provide that the Commissioner may use evidence from other sources to show the severity of an impairment and how it affects the ability to work. 20 C.F.R. §§ 404.1513(d), 416.913(d). *See also* Social Security Ruling ("SSR") 06-3p; *Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007) (holding that ALJ generally should explain weight given to opinions from "other sources" or otherwise ensure that the discussion of the evidence in the decision allows the subsequent reviewer to follow the adjudicator's reasoning when such opinions may have an effect on the outcome of the case).

The ALJ gave specific reasons for affording little weight to Ms. Doss' opinion, including the inconsistency between that opinion and the treatment records. (R. 44-45). The record contains substantial evidence to support the ALJ's findings in that regard. Weighing the evidence is precisely the duty of the ALJ. *White*, 287 F.3d at 905. Where, as here, the ALJ indicates he has considered all the evidence, the court's practice is to take the ALJ at his word. *See Wall,* 561 F.3d at 1070. The court may not reweigh the evidence nor substitute its judgment for that of the ALJ. The court need only determine whether the record evidence supports the ALJ's finding. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008). Furthermore, the ALJ provided the rationale for his decision and the factual basis for his conclusion. *See Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012) (holding that reversal is not warranted where subsequent reviewer can follow the adjudicator's reasoning in conducting review and can determine that correct legal standards have been applied). In this case, the record contains substantial evidence to support the ALJ's findings. Therefore, the court will not disturb the Commissioner's decision on the basis that the ALJ failed to properly consider the opinion of Dickinson's "treating psychotherapist." [Dkt. 19, at 4].

Regarding Dickinson's proffer of "[p]owerful new evidence" that was submitted to the Appeals Council, the court finds no basis for reversal. The Appeals Council must consider additional evidence submitted with a request to review an ALJ's decision if the evidence is "(a) new, (b) material, and (c) relate[d] to the period on or before the date of the ALJ's decision." *Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004) (citing 20 C.F.R. §§ 404.970 (b) and 416.1470(b)). It is a question of law for the court to decide whether the evidence meets these qualifications. *Id.* The Tenth Circuit has summarized the relevant principles as follows:

> [i]f the evidence does not qualify, it plays no further role in judicial review of the Commissioner's decision. If the evidence does qualify and the Appeals Council considered it in connection with the claimant's request for administrative review (regardless of whether review was ultimately denied), it becomes part of the record we assess in evaluating the Commissioner's denial of benefits under the substantial-evidence standard. Finally, if the evidence qualifies but the Appeals Council did not consider it, the case should be remanded for further proceedings.

*Id.* (citations omitted).

Here, the additional evidence submitted to the Appeals Council consists of a "Diagnostic Assessment" by Lindsey Brooks, Psy.D., dated January 15, 2014, a Medical Source Statement - Mental by Brooks dated January 17, 2014, and Dickinson's personal journal dated January 1, 2013 to August 31, 2013. (R. 10-16, 31-32, 54-189). The ALJ issued his decision on December 18, 2013, and the relevant period is December 15, 2009 through December 31, 2012. (R. 37-47). The Appeals Council "looked at" the additional evidence and determined that the new information is about a later time and did not affect the decision about whether Dickinson was disabled at the time she was last insured for disability benefits. (R. 2). The medical opinion assessing Dickinson's condition on a date subsequent to the date of the ALJ's decision is not related to the period on or before the ALJ's decision or the relevant period for the determination. Therefore, the Appeals Council properly declined to consider this evidence. *See Boone v. Apfel*, 1999 WL 668253, at *3 (10th Cir. Aug. 26, 1999)[4] (declining to consider additional evidence of treating physician when it was dated after the ALJ's decision, even though evidence discussed claimant's prior medical history).

The ALJ's discussion of the evidence and his stated reasons for his conclusions demonstrate that he adequately considered Dickinson's alleged impairments. *See Fisher-Ross*,

---

[4]Unpublished decisions are precedential but may be cited for their persuasive value. *See* FED.R.APP. 32.1; 10th Cir.R. 32.1.

431 F.3d at 730 (evaluating whether the substantial evidence test has been met is based on the ALJ's decision as a whole). The record as a whole contains sufficient evidence that a reasonable mind might accept to support the ALJ's conclusion that Dickinson was not disabled prior to December 31, 2012, the date her disability insurance expired. Therefore, the ALJ's decision is based upon substantial evidence in the record.

## Conclusion

Because it is clear that the ALJ considered all the medical evidence in accordance with the regulatory factors for weighing medical opinions, the court finds no reversible error on this basis. Accordingly, the court AFFIRMS the decision of the Commissioner finding Dickinson not disabled prior to the date she was last insured.

Dated this 27th day of September, 2016.

Paul J. Cleary
United States Magistrate Judge